670 P.2d 854

**Herbert ALLEN, Appellant,**

v.

**LEWIS–CLARK STATE COLLEGE, State Board of Education, State of Idaho, Respondents.**

**No. 14072.**

Supreme Court of Idaho.

Sept. 28, 1983.

Merlyn W. Clark and P. Mark Thompson, Boise, for appellant.

Robert P. Brown, Lewiston, Jim Jones, Atty. Gen., Steven W. Berenter, Deputy Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for respondents.

BISTLINE, Justice.

This case involves an appeal from a decision of the State Board of Education upholding the discharge of the appellant Herbert Allen from his employment as chief of campus security at Lewis-Clark State College (LCSC) in Lewiston, Idaho.

Mr. Allen was employed part-time as chief of campus security at LCSC from 1972 until his discharge on September 12, 1978. During that time, Mr. Allen was also em-

ployed by LCSC as a full-time tenured faculty member in the police officer training program. As chief of campus security, Mr. Allen was responsible for the overall coordination of campus security and the supervision of security personnel. In this capacity, Mr. Allen worked directly with and under Dr. Lee Vickers, president of LCSC.

Mr. Allen was terminated from his part-time position after making public statements during a campus and community controversy over whether student security officers should continue to carry firearms. The question of whether campus security personnel should be allowed to carry firearms had been a controversial issue for many years. However, in 1978 local and state law enforcement agencies declined to commission the campus security personnel so as to give them official authority as law enforcement officers. Because this created a potential problem of liability for the college, President Vickers determined that the security personnel would not be permitted to carry firearms. Although Mr. Allen did not agree with this decision, he followed the president's directions and attempted to implement the new policy. However, the student security officers refused to work without their weapons.

On Saturday, September 9, 1978, an article appeared in the Lewiston Morning Tribune regarding the situation. Mr. Allen was quoted as making the following statement:

"I don't believe anybody should shoot anybody. I'm against killing anything or anybody unless it's necessary to save a life. But let's face reality—there are murderers, rapists and burglars around. Somebody's got to defend the rest of the population."

Later in the same article he was quoted as follows:

"They're professionals. . . . There's three or four colored guys on campus from California who have been hassling the officers a little bit. It doesn't bother them. They can handle it."

Mr. Allen claims that the news article omitted a portion of his statement when

quoting his remarks about and reference to perpetrators of crime, and that he did not intend to refer to persons on campus:

"A newspaper reporter and photographer appeared at [Mr. Allen's] office on Friday afternoon and requested an interview. During the interview, he was asked why the officers needed guns. He informed the reporter that when you have a large population, there are 'murders, rapists, and burglars around, and that somebody (police or security officers) has to defend the rest of the population.' The news article, as indicated by the hyphen after the word 'reality' omitted the reference to the 'large population' when quoting his remarks and reference to perpetrators of crimes. Appellant did not intend to refer to, nor did he limit his remarks to persons on campus."

Appellant's Brief, p. 7.

Furthermore, Allen claims that the second quotation was taken out of context. He claims that in answer to a question regarding recent incidents on campus he stated that the best example that came to mind was a report from an officer that "three or four colored guys from California" had "hassled" a security officer while on patrol near the gymnasium, but that it was nothing serious.

The article generated adverse reactions on campus, particularly among the small number of black students at LCSC (eight or nine), some of whom felt they had been singled out and equated with murderers, rapists and robbers. In addition, some controversy arose over Allen's use of the term "colored." On the day the article appeared, the LCSC student body president telephoned Mr. Allen and informed him that his remarks were causing problems. Later that day Mr. Allen returned a call to the Tribune and discussed the situation with someone who Mr. Allen claims he did not know was a reporter. On Sunday, September 10, 1978, another article appeared in the Tribune, containing Mr. Allen's explanation of the earlier article.

"Allen told the Tribune Saturday that he wasn't singling out the blacks as trouble for the security officers, but just citing the latest incident where officers have received some harassment from students.

"As for using the term 'colored,' Allen said he was 'raised in the South, where we called the good ones colored and the bad ones niggers.'"

This explanation exacerbated the situation and generated extreme adverse reactions on campus and in the community. Mr. Allen has not alleged that he was misquoted in the second article.

On Monday, September 11, President Vickers summoned Mr. Allen to his office. President Vickers informed Mr. Allen that his actions had created an embarrassment to the school and stated that he should make a public apology. Mr. Allen in turn stated that he had done nothing wrong and declined to apologize. At the end of a conversation which lasted approximately twenty to thirty minutes, President Vickers advised Mr. Allen that if he did not apologize he would have the option of resigning or being terminated. When Mr. Allen refused to resign, President Vickers fired him. On September 12, the day following Mr. Allen's dismissal, President Vickers gave Mr. Allen a letter informing him that he had been relieved of his duties as chief of campus security, effective September 11, 1978. The letter provided in part:

"Individuals in this capacity must reflect through their attitude and their actions a posture that is congruent with an institution of higher education, i.e., Lewis-Clark State College. Since your recent actions have been detrimental to the image of the institution and since, as you indicated in our conversation on Monday, you are not willing to modify your position in an attempt to rectify the situation, I feel compelled to take this action."

Thereafter Mr. Allen notified President Vickers of his wish to appeal his dismissal, and a faculty administrative hearing board was convened to review the dismissal and make a recommendation. A hearing was held on October 9, 1978, at which time Allen appeared before the hearing board, was

represented by counsel, and was given the opportunity to present evidence and to cross-examine witnesses presented by the college. The written decision of the hearing board, which was issued on October 10, 1978, stated:

"That this Administrative Hearing Board recommend to President Vickers that Herbert Allen be reinstated as Chief of Campus Security provided Mr. Allen express publicly suitable regrets for the unfortunate situation which has developed."

President Vickers took the hearing board's recommendation under advisement, and on October 12, issued a memorandum rejecting the recommendation: "After considering your recommendation, I feel that I must reject it on the basis that forced 'publicly suitable regrets' at this point in time would be perfunctory, insincere and without credibility." At the time President Vickers issued the memorandum he had received no word from Mr. Allen regarding his willingness to comply with the board's recommendation. However, on that same date Mr. Allen had written a letter expressing his regrets regarding the situation and stating that it was not his practice to discriminate against any minority in his job or in his personal life. The letter was sent to President Vickers, the Governor, the Board of Education, members of the hearing board, and the Tribune. President Vickers later testified that he did not wait for a response from Mr. Allen to the hearing board's memorandum because he considered

any apology to be too late and he stated that he would not have changed his mind even if he had known of the letter.[1]

In a letter to the State Board of Education, dated October 20, 1978, Mr. Allen requested a formal hearing. The request was granted and Michael McNichols was appointed by the Board to serve as the hearing officer. A hearing was held before Mr. McNichols on December 13, 1978, at which testimony was submitted in support of and in opposition to the termination. At the close of the hearing, Mr. McNichols indicated that he thought President Vickers' determination of good cause was supported by the evidence, but that he had reservations on the first amendment and due process issues. Mr. McNichols issued his opinion and recommendation to the Board on May 8, 1979. The opinion concluded: (1) that the procedures required by Section 513.59 of the Personnel Policies of the State Board of Education were not followed in Mr. Allen's case; (2) that Mr. Allen had a property right in this employment, the existence of which entitled him to be afforded due process of law and that due process was not provided; and (3) that Mr. Allen's discharge was based, in part, on the constitutionally impermissible ground of his exercise of his right to free speech. Based upon these conclusions Mr. McNichols recommended that "Lewis-Clark State College pay to Mr. Allen the sums of money Mr. Allen would have otherwise been paid under the terms of his contract, less any sums earned by Mr.

---

1. Allen has steadfastly maintained that his letter was not an "apology" since it was not "an admission of error or discourtesy."

"Appellant was never given the alternative [by President Vickers] of expressing 'publicly suitable regrets'—the option offered by the faculty committee. 'Apology' is defined in Webster's Seventh New Collegiate Dictionary, to mean 'an admission of error or discourtesy accompanied by an expression of regret.' 'Regret' is defined in Webster's as 'sorrow aroused by circumstances beyond one's power to remedy ... an expression of sorrow, disappointment, or other distressing emotion.'

"President Vickers refused to accept anything less than a public admission of error or discourtesy. *Appellant refused to admit er-*

*ror or discourtesy because he perceived no error or discourtesy;* he maintained that posture through the faculty hearing and the hearing before Hearing Officer McNichols. However, he readily 'expressed publicly suitable regrets,' as requested in the faculty decision. As stated in his letter (Exhibit 30):

" 'Without any reluctance, I do very much regret the emotional turmoil that developed on campus and any negative feelings about the college that may have resulted.'
and:

" 'Again, I do regret that the situation arose and hope that the matter can now be resolved without further conflict on campus.' "
Appellant's Reply Brief, p. 6.

Allen in place of his earnings under the contract." No recommendation was made relative to reinstatement of Mr. Allen.

Following the issuance of the hearing officer's opinion, the matter was submitted to the State Board of Education. A hearing was held on October 10, 1979, and thereafter, the Board entered its findings of facts and conclusions of law, finding that "good cause" existed for Mr. Allen's termination. The Board then concluded that Mr. Allen should not be reinstated as Chief of Campus Security and that he should receive no compensation beyond the date of his termination.

Mr. Allen appealed the decision of the Board to the district court, which affirmed the decision of the Board and subsequently denied Mr. Allen's request for reconsideration. This appeal was perfected from the decision of the district court.

## I.

Mr. Allen has sought judicial review of the decision of the State Board of Education pursuant to I.C. § 67–5215. This section specifically defines the scope of judicial review of a decision of an agency of the state.[2] Under I.C. § 67–5215(g), a reviewing court is required to make its own independent determination of questions of law if the substantial rights of the appellant have been prejudiced by the action of the agency. However, a reviewing court cannot "substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." In order to reverse or modify the findings of an agency, the reviewing court must determine that the findings of the agency are "clearly erroneous" or "arbitrary or capricious." In this case we have been called upon to review both questions of law and findings of fact.

## II.

The initial question before this Court is whether Mr. Allen was a classified employee entitled to the protections and rights of the Idaho civil service laws. The Board of Education found that he was not, that he was an exempt employee pursuant to I.C. § 67–5303(i). This finding was affirmed on appeal to the district court.

Chapter 53 of Title 67 of the Idaho Code established the Idaho Personnel Commission, which is authorized and directed to administer a personnel system for classified state employees. I.C. § 67–5303 provides that "[a]ll departments of the state of Idaho and all employees in such Departments except those employees specifically exempt, shall be subject to this act and to the system of personnel administration which it prescribes." LCSC, as a state institution under the State Board of Education, is a department within the meaning of the Act. I.C. § 67–5302(7) (" 'Department' means any department, agency, institution or office of the state of Idaho."). Therefore, employees of LCSC, including Mr. Allen, are subject to the provisions of the Act unless they are exempt.

The exemptions to the Act are set forth in I.C. § 67–5303(i), which provides that exempt employees shall be:

"(i) Officers and members of the teaching staffs of state institutions and the professional staff of the Idaho Department of Education administered by the Board of Regents and the Board of Education, .... The word 'officer' as used in this subsection means presidents, vice presidents, deans, or directors, or employees in any positions meeting all of the following criteria:

1. Answers directly to or is responsible to a person occupying an administrative position no lower than dean or director level; and,

2. Is involved in or substantially participates in the development of policy; and,

---

**2.** "Agency" is defined under the Administrative Procedure Act to mean "each state board, commission, department or officer authorized by law ... to determine contested cases." I.C. section 67–5201(1). A "contested case" means "a proceeding ... in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing; ...." I.C. section 67–5201(2).

3. Receives an annual salary of not less than the equivalent of step one (1) of pay grade twenty-four (24) of the state salary schedule; and,

4. Requires not less than an earned bachelor's degree from an accredited college or university, or equivalent as prescribed by the personnel commission."

Mr. Allen was not an employee meeting all the criteria set forth above since his annual salary was substantially below that required[3] and there was no evidence that a bachelor's degree or its equivalent was a requirement for his position. Accordingly, the question becomes whether Mr. Allen was exempt because his position as chief of security was that of a "director" as set forth in I.C. § 67–5303(i).

The term "director" is not defined in I.C. § 67–5303(i). Mr. Allen argues that the term should be given the statutory definition contained in I.C. § 67–2403:

"Each department, unless specifically provided otherwise, shall have an officer as its executive and administrative head who shall be known as a director. The director of each department shall, subject to the provisions of law, execute the powers and discharge the duties vested by the law in his department."

■ The term "director," as used in Chapter 24, Title 7 of the Idaho Code, refers to heads of specifically enumerated departments. *See* I.C. §§ 67–2402 and –2406. However, I.C. § 67–5303(i) refers to "directors" in the context of state institutions. Since under the definition of "director" found in I.C. § 67–2403 there would be no directors in state institutions, clearly that definition is inapplicable. Furthermore, we agree with the district court that such a definition of the term "director" as it is used in I.C. § 67–5303(i) would be "too limited." R., p. 18. As noted by the district court:

"Apparently the legislature sought to include more than the limited definition in

I.C. § 67–2403. This conclusion is supported by use of the term 'directors' in the same context as vice-presidents and deans, positions of substantial authority but less than the authority to administer the whole agency. The scheme of I.C. § 67–5303(i) indicates that 'directors' are persons with authority analogous to 'deans.' "

R., p. 18.

We believe that the term "director" should be given its ordinary meaning, that being "[one] who supervises, controls or manages." The American Heritage Dictionary 373 (1975). *See* 26A C.J.S. 958 (1956) (defining director as "one who directs, regulates, orders, controls, or conducts; one who regulates, guides or orders, a chief administrative official, a manager or superintendent.").

■ The record in this case demonstrates that Mr. Allen, in his capacity as the chief of campus security, supervised, controlled, and managed the activities of the LCSC campus security forces. As was noted by the district court:

"It does not appear that calling Mr. Allen chief of campus security, rather than director of campus security, should make any difference. The question is whether his position was of such status as to fall within the purpose of the legislation to exempt positions of authority. The Court concludes that it was. He was answerable directly to the president of the college. . . . He was responsible for the supervision of all security police or patrolmen, and he was responsible for liaison with off-campus agencies, subject to the duty to report on these matters to the president. . . . In fact the evidence is clear that in his position Mr. Allen did coordinate with the local agencies and did take an active role in the formation of policies. Despite the part-time nature of the work and the limited pay, the position of chief of campus security was one of authority, and Mr. Allen was treated as

---

3. Mr. Allen's salary for his part-time position as chief of campus security for the 1978–79 fiscal year was $3,183. This is substantially less than the salary for an employee at step one of the pay grade twenty-four of the state salary schedule. *See* I.C. section 67–5309C.

the head of a department with broad discretion."

R., pp. 18–19.

We agree with the rationale of the district court. Although Mr. Allen's title was that of "chief" rather than "director" of campus security, that distinction does not affect his status under the civil service laws of the state. Accordingly, we hold that Mr. Allen was an exempt employee within the contemplation of I.C. § 67–5303(i), as the head of campus security.

### III.

■ Although not a classified state employee, Mr. Allen was employed by LCSC pursuant to an annual contract.[4] Therefore, under the Personnel Policies of the State Board of Education Mr. Allen could be discharged only for "good cause." Section 513.59 of the Personnel Policies provides in part that "[d]ismissal ... of ... nonteaching personnel before the expiration of the stated period of employment will be only for good cause shown."

### A.

Mr. Allen argues that the term "good cause," is vague and that it was applied to terminate him in violation of his constitutional right to due process of law. Mr. Allen contends that "the policy did not provide standards to warn [him] of the proscribed conduct and the perils of violation nor did it provide standards 'against which conduct can be uniformly judged by courts and administrative agencies,'" citing *Tuma v. Board of Nursing,* 100 Idaho 74, 593 P.2d 711 (1979). Appellant's Brief, p. 32 (emphasis deleted).

Mr. Allen's vagueness challenge is foreclosed by *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), in which the Supreme Court held that the phrase "such cause as will promote the efficiency of the service" was constitutionally sufficient against the charge of vagueness. Writing for the plurality, Justice Rehnquist stated:

"A certain anomaly attends appellee's substantive constitutional attack on the Lloyd-La Follette Act just as it does his attack on its procedural provisions. Prior to the enactment of this language in 1912, there was no such statutory inhibition on the authority of the Government to discharge a federal employee, and an employee could be discharged with or without cause for conduct which was not protected under the First Amendment. Yet under the District Court's holding, a federal employee after the enactment of the Lloyd-La Follette Act may not even be discharged for conduct which constitutes 'cause' for discharge and which is not protected by the First Amendment, because the guarantee of job security which Congress chose to accord employees is 'vague' and 'overbroad.'

"We hold the standard of 'cause' set forth in the Lloyd-La Follette Act as a limitation on the Government's authority to discharge federal employees is constitutionally sufficient against the charges both of overbreadth and of vagueness. In *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 578–579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973), we said:

"'[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on

---

4. Although there was a written contract for the 1977–78 school year between Allen and LCSC, because of an oversight there was no formal contract for 1978–79. Mr. Allen simply received a memorandum from the president of the college stating that the salary for the position of chief security officer for the fiscal year 1978–79 would be $3,182. However, it is undisputed that Mr. Allen was employed pursuant to contract and entitled to the protections of the Personnel Policies of the State Board of Education. *See generally* 53 Am.Jur.2d, *Master and Servant* section 23, pp. 99–100 (1970) ("It is the general rule ... that when, upon the expiration of a contract of employment for a definite term, the employee continues to render the same services as he rendered during the term of the contract without explicitly entering into any new agreement, it will be presumed prima facie that he is serving under a new contract having the same terms and conditions as the original one.").

finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. "[T]he general class of offense to which ... [the provisions are] directed is plainly within [their] terms ..., [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise." *United States v. Harriss,* 347 U.S. 612, 618 [74 S.Ct. 808, 812, 98 L.Ed. 989] (1954).'

Congress sought to lay down an admittedly general standard, not for the purpose of defining criminal conduct, but in order to give myriad different federal employees performing widely disparate tasks a common standard of job protection. We do not believe that Congress was confined to the choice of enacting a detailed code of employee conduct, or else granting no job protection at all."

416 U.S. at 158–59, 94 S.Ct. at 1646–47. Although the plurality opinion spoke for only three justices, Justices Powell and Blackmun, and Justice White, concurred in part, in joining the plurality's treatment of the vagueness issue.

It might be argued that *Arnett* can be distinguished because the federal employees in that case had the benefit of a personnel manual which added some specificity to the statute at issue and because the general counsel of the agency involved was available to construe the statute for employees. However, that argument was persuasively put to rest by the First Circuit Court of Appeals in *Wishart v. McDonald,* 500 F.2d 1110, 1116 (1st Cir.1974) (holding that the phrase "conduct unbecoming a teacher" was not unconstitutionally vague):

> "We do not find the difference material. The Federal Personnel Manual referred to in *Arnett* included the following 'specifics':
>
> > " 'Basically a "cause" for disciplinary adverse action is a recognizable offense against the employer-employee relationship. Causes for adverse action run the gamut of offenses against the employer-employee relationship, including inadequate performance of duties and improper conduct on or off the job ....'

This added nothing of value to the statutory standard except to give notice of its enormous breadth. Nor do we find the availability of counsel significant when, in [the appellant's] case, there is no indication that the sort of conduct in which he engaged is one for which he was apt to seek legal advice."

Section 513.59, of the Personnel Policies, like the Lloyd-La Follette Act discussed in *Arnett,* was intended to provide a variety of state employees performing disparate tasks a common standard of job protection, not for the purpose of defining misconduct or criminal conduct, as was the case in *Tuma, supra.* Thus, under the reasoning of *Arnett,* a general standard may be necessary, and certainly is proper.

As was noted by the court in *Horn v. Burns and Roe,* 536 F.2d 251, 254–55 (8th Cir.1976): "A noncriminal statute is not unconstitutionally vague ... where its terms are such that the ordinary person exercising common sense can sufficiently understand and fulfill its prescriptions.... The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." Although the term "good cause" is not defined in Section 513.59, that term, as it is commonly understood and used, means: "Substantial reason, one that affords a legal excuse. Legally sufficient ground or reason." Black's Law Dictionary 623 (5th ed. 1979). Thus, reasons which are arbitrary, frivolous or irrelevant cannot constitute good cause as that phrase is ordinarily understood. We are also given some guidance as to the meaning of "good cause" as used in Section 513.59, by the definition of the term "cause" found in Section 513.59, which provides:

> "Cause for dismissal or termination of a faculty member shall be any conduct seriously prejudicial to the institution, its

students or faculty; for example (but not by way of limitation) immorality, criminality, dishonesty, unprofessional conduct, actions in violation of policies, directives or orders of the Board, incompetence in the performance of his or her assigned or contractual duties, and failure to perform his or her assigned or contractual duties."

We believe that "cause" as defined in this section, even though used in conjunction with the requisite "good cause" for the dismissal or termination of a faculty member, demonstrates the type of conduct the Board of Education contemplated would justify the dismissal of a contract employee before the expiration of the stated term of employment. Thus, a contract employee may not be dismissed for conduct unrelated to the performance of his job or the welfare of the institution by which he is employed. Under the circumstances, we conclude that the ordinary person exercising common sense could sufficiently understand the meaning of the term "good cause" as it is used in Section 513.59 to conduct himself or herself in a manner as to avoid termination. Accordingly, we hold that the term as used in Section 513.59 of the Personnel Policies of the State Board of Education is not unconstitutionally vague.

### B.

The Board made the following findings of fact in concluding that Mr. Allen was discharged "for good cause shown:"

#### "VII.

"It was the practice at LEWIS–CLARK STATE COLLEGE to man the Campus Security Program by utilization of students enrolled and participating in the Police Officer Training Program. . . . For several years controversy existed in the community and on campus of the practice of arming the personnel with firearms or sidearms.

#### "VIII.

"Between the dates of September 8th and September 12th, 1978, considerable notoriety arose over the determination of the executive president's decision to prohibit the carrying of weapons by campus security.

#### "IX.

"Herbert Allen was contacted by representatives of the Press in response to the change in campus policy. During interviews, Appellant Allen made reference to the fact that there did exist in society, murderers, rapists and robbers and, in addition, there were some colored people from California on campus who had hassled the security personnel. At a subsequent interview, in amplification of his former statements, Mr. Allen is reported as stating that he was reared in the South and that the good colored people were referred to as 'good blacks' and the bad colored people as 'niggers.'

. . . .

#### "XXVIII.

"It is especially found by the Board, based upon the record, evidence and exhibits, that the statements of Herbert Allen, appellant herein, did cause and create a condition that affected the students, minority students, the community and the statements were inappropriate for a person in a sensitive position as Chief of Campus Police to render and utter.

#### "XXIX.

"The statements made by Mr. Allen . . . were made by him in a position of authority in representation of Lewis-Clark State College and in expression of his own personal social and racial beliefs.

#### "XXX.

"One of the paramount functions of an educational institution is the establishment of an inter-racial understanding of the right to racial dignity. Educational institutions provide a primary basis for eradication of historic concepts that have

existed without basis emanating solely from bias or bigotry.

. . . .

"XXXVI.

"The Board finds that based upon the evidence and the record herein that Mr. Allen was well aware as the Head of Security and as a tenured teacher in the Vocational Police Training at Lewis-Clark State College, that the gun issue in and of itself was controversial, with legal implications and overtones. The decision as to the permissible carrying of side arms by trainee cadets upon the Campus at Lewis-Clark State College was solely subject to the Administrative determination by its President, Dr. Vickers, and none other.

"XXXVII.

"That when decision was made to bar the carrying of firearms by Dr. Vickers, the subsequent and ultimate position of appellant, HERBERT ALLEN, as reflected by the evidence and the record, not only challenged that decision, but broadened the entire controversy unexcusably into racial-social areas.

"XXXVIII.

"The statements made by appellant, HERBERT ALLEN, in relation to the underlying controversy, with particular amplification thereof into racial-social stigmas, evidences traits of employment incompatibility in a sensitive position as Head of Police Security on a college campus.

"XXXIX.

"The Board does find that there was good cause existent for the termination of HERBERT ALLEN by Dr. Vickers, and that Dr. Vickers pursuant to personnel policies of the State Board of Education, was authorized and empowered,

upon good cause, to terminate HERBERT ALLEN from his position as Head of Campus Security Police. The Board especially finds that good cause was shown pursuant to Section 513.59 of the Personnel Policies of the State Board of Education."

██ Mr. Allen contends that "good cause" to justify termination did not exist in this case. However, he makes no meritorious argument that the findings upon which the board's determination of "good cause" was based are not supported by the evidence. Indeed, a review of the record in this case demonstrates that such an argument would be without merit, there being ample evidence to support the findings of the board which underlie its determination of cause.[5] Mr. Allen simply contends that "good cause" to justify termination did not exist. Thus, the question for this Court to determine is simply whether the Board's finding of "good cause" was arbitrary, capricious, or an abuse of discretion. I.C. § 67–5215(g).

██ Mr. Allen argues that "good cause" did not exist because his use of the term "colored" was "an innocuous means of identifying troublemakers" and that "race is an identifying characteristic which is traditionally used by police personnel." Appellant's Brief, p. 33. He further argues that his use of the term "niggers" could not be a basis for finding "good cause" because he did not refer to any of the black students at LCSC or the black citizens of Lewiston as being 'niggers'; he was, instead, merely attempting to explain his use of the term 'colored' in his previous interview." Even accepting Mr. Allen's argument that he did not intend to offend anyone, we do not believe that the board acted arbitrarily, capriciously, or with an abuse of discretion in determining that Mr. Allen's conduct constituted "good cause" for his dismissal.

Without doubt, Mr. Allen's conduct was an embarrassment to LCSC. It had a dis-

5. For an excellent discussion of the evidence in the record which supports the Board's findings, *see* Respondent's Brief, pp. 33–41.

ruptive influence on campus as well as the community. Mr. Allen's statements broadened the gun controversy into racial-social areas, by initially referring to murderers, rapists, and burglars in connection with the debate on campus security and by referring to "colored guys" as troublemakers on campus at a time when there were only eight or nine black students on campus. With regard to whether Mr. Allen's use of the term "colored" was objectionable, even if we accept the premise that the term still may be accepted in some circumstances as appropriate, and thus perhaps excusable, his explanation of why he used that term in this case was clearly not excusable. Mr. Allen's statement made in his capacity as Chief of Campus Security, can absolutely not be justified on the basis that he was "raised in the South, where we called the good ones colored and the bad ones niggers." Mr. Allen's statements clearly demonstrate a lack of discretion and judgment on his part. These statements, along with his inability to recognize any wrongdoing or error on his part, were not conduct in accordance with that which the college is entitled to expect from its employees and representatives, especially those in sensitive positions such as the chief of campus security. The comments of the district court are persuasive:

> "Even uneducated and insensitive people understand that use of a clearly known racial epithet to classify a group of people will raise hackles and spawn intense feelings. The statement was unnecessary and could serve no purpose except to agitate people. *Even if that were not the intent, the result was predictable.* The problem compounded when Mr. Allen met with Dr. Vickers, who told him there was a problem and that he wanted a public apology for his comments. Mr. Allen said there was no problem and refused to apologize."

R., p. 23 (emphasis added).

The evidence in the record supports the Board's findings that Mr. Allen's conduct evidenced traits of employment incompatibility and that it adversely affected the welfare of LCSC. Given this factual basis for the Board's conclusion that "good

cause" existed to discharge Mr. Allen, we cannot say that the Board's conclusion was arbitrary, capricious, or an abuse of discretion. *See Enterprise, Inc. v. Nampa City,* 96 Idaho 734, 536 P.2d 729 (1975) (stating that for a public officer's acts to be "arbitrary or capricious" or an "abuse of discretion," it must be shown that he acted without a rational basis or in clear disregard of the facts and circumstances presented). Accordingly, the Board's finding of "good cause" must be upheld on appeal.

## IV.

Mr. Allen also argues that he was discharged in violation of his first amendment right to freedom of speech since his discharge was based upon comments made by him in a public forum regarding a matter of significant public concern. This contention was rejected by the Board and the district court, both of which held that Mr. Allen's statements reflected adversely on his ability to properly perform the duties of chief of campus security and thus could provide a basis for his discharge from that position.

■ It is a well-established principle that a public employee cannot be discharged for a constitutionally impermissible reason. *See Connick v. Myers,* —— U.S. ——, ——, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). It is Mr. Allen's contention that he was discharged for exercising his rights under the first amendment to the United States Constitution, which provides in part that Congress "shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. 1.

■ "Freedom of speech . . . [is] among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." *Lovell v. City of Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). However, the right to free speech is not absolute. As was stated by the United States Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct.

1731, 1734–35, 20 L.Ed.2d 811 (1968), "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Munch v. Board of Correction,* 105 Idaho 53, 56 n. 6, 665 P.2d 1063, 1066 n. 6 (1983).

In this case we must balance Mr. Allen's right to speak freely against the right of the college to maintain the efficiency and effectiveness of its security forces. In weighing the competing interests of Mr. Allen and LCSC, we are guided by the factors set forth in *Pickering* and those set forth in subsequent cases which have applied the *Pickering* rationale.

In this case, without doubt, the gun controversy was one of legitimate public concern and Mr. Allen, as chief of campus security, was likely to have information relevant to the issue and an opinion on the matter. Therefore, it was essential that Mr. Allen be able to comment on the issue of whether security personnel should be allowed to carry firearms without fear of retaliatory dismissal. *See, Pickering, supra,* 391 U.S. at 571–72, 88 S.Ct. at 1736. However, the same thing certainly cannot be said with regard to Mr. Allen's racial views or experiences, clearly not matters of legitimate public concern upon which open debate is vital to informed decisionmaking by the public. *See Kannisto v. City and County of San Francisco,* 541 F.2d 841, 844 (9th Cir.1976). Thus, such speech must be considered accordingly.

LCSC, on the other hand, has a strong interest in maintaining a high level of service to the community and the State, by employing individuals who possess qualifications and characteristics consistent with the special role of the college, and by eliminating conduct which may reasonably be thought to impede the proper performance by an employee of his duties. *Phillips v. Adult Probation Department,* 491 F.2d 951 (9th Cir.1974). *See Connick, supra,* —— U.S. at ——, 103 S.Ct. at 1691; *Arnett v.*

*Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974); *Megill v. Board of Regents,* 541 F.2d 1073 (5th Cir.1976); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488 (7th Cir.1972). "This governmental interest may, consistent with the First Amendment, require public employees 'to suspend or refrain from certain activities * * * that are embraced within the constitutional rights of others, when such activities are reasonably inconsistent with their public status and duties.' *Meehan* [*v. Macy*], 392 F.2d [822,] 832 [(1968)]." *Phillips, supra,* 491 F.2d at 955.

In determining whether a public employee has been discharged in violation of his first amendment rights, such a claim must be considered "in light of the special characteristics of the environment in the particular case." *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir.1972). *See Connick, supra,* —— U.S. at ——, 103 S.Ct. at 1691 (noting that the manner, time and place are relevant considerations in determining whether certain activities are protected under the first amendment). The most notable aspect of environment in this case, is that Mr. Allen was employed by a state college, an institution at which tradition (and the public) demands that the highest standards be maintained. As was noted by the Board in its findings:

"One of the paramount functions of an educational institution is the establishment of an inter-racial understanding of the right to racial dignity. Educational institutions provide a primary basis for eradication of historic concepts that have existed without basis emanating solely from bias or bigotry."

An additional relevant consideration in this case was that Mr. Allen's position at the college was that of chief of security (the campus equivalent of chief of police), a position with special responsibilities. *See Kannisto v. City and County of San Francisco,* 541 F.2d 841, 844 (9th Cir.1976) (noting that the claimed first amendment right of a police officer who was discharged for criticizing his superior was not the same as the right asserted in *Pickering*); *Muller v.*

*Conlisk,* 429 F.2d 901, 904 (7th Cir.1970) (noting that the role of the police does not make *Pickering* inapplicable, but possibly influences the balance which must be struck in the case); *Meehan v. Macey,* 392 F.2d 822, 834 (D.C.Cir.1968) (noting that policemen have special duties and responsibilities which may affect their rights under the first amendment), *modified,* 425 F.2d 469, *affm'd en banc* 425 F.2d 472 (1969). Mr. Allen was contacted by the press and spoke as a representative of LCSC. His comments were made at a time when there existed on campus and in the community controversy over the issue of whether campus security personnel should be allowed to carry firearms. Mr. Allen was aware of this controversy, and the uncontradicted testimony of Dr. Vickers was that he had cautioned Mr. Allen that "we had to be very careful as to how we handled [the issue]." Tr., p. 16.

Given these circumstances, the Board found that Mr. Allen's conduct had an adverse effect on campus and in the community because it inexcusably broadened the existing controversy on the gun issue into racial-social areas, and that his conduct evidenced traits of employment incompatibility with the sensitive position of chief of campus security. As discussed *supra* in part III, these findings are supported by the evidence. Such findings have consistently been held to be a legitimate basis for dismissal of a public employee over claimed violations of first amendment rights. *See Cooper v. Johnson,* 590 F.2d 559, 562 (4th Cir.1979) (upholding the dismissal of a deputy sheriff whose speech was likely to create a debate where none existed); *Garza v. Rodriquez,* 559 F.2d 259, 260–61 (5th Cir. 1977) (the first amendment does not protect a public employee whose speech evidences character traits undesirable to his employer); *Megill v. Board of Regents,* 541 F.2d 1073, 1083–85 (5th Cir.1976) (upholding the

dismissal of a teacher whose public speech and conduct evidenced a lack of discretion and professional maturity); *Phillips v. Adult Probation Department,* 491 F.2d 951, 955 (9th Cir.1974) (upholding the discharge of a probation officer on the basis that his displaying of a certain poster was inconsistent with his functions as a probation officer and was likely to impair the efficiency of the department). *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir. 1972) (upholding dismissal of teacher for making speeches using profane language and criticizing university administration and policies on the basis that such conduct was a breach of minimal duty of loyalty and civility).

■ Having carefully reviewed the record in this case and relevant case law on the issue, we believe that in balancing the competing interests of the parties, the interests of LCSC in maintaining the efficiency and effectiveness of its security forces outweigh whatever interests Mr. Allen may have had under the circumstances in this case. Accordingly, we hold that Mr. Allen was not discharged in violation of his first amendment rights.

V.

■ Mr. Allen also argues that he was denied due process of law by virtue of the procedures followed by the respondents in this case.[6] Although he concedes that he "did receive a full and fair hearing before Mr. McNichols, Appellant's Reply Brief, p. 12, he contends that a full evidentiary hearing as contemplated in *Goldberg v. Kelly,* 397 U.S. 254, 266–71, 90 S.Ct. 1011, 1019–22, 25 L.Ed.2d 287 (1970), should have been provided prior to his discharge by President Vickers, including: "(1) written notice of the grounds for termination, (2) disclosure of the evidence supporting termination, (3) the right to confront and cross-examine adverse witnesses, (4) an opportunity to be

---

**6.** There is no question in this case that Mr. Allen possessed an interest in his continued employment as chief of campus security that was entitled to the protections of due process. A term of employment set by a contract is a property interest safeguarded by due process.

*Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488, 494 (7th Cir.1972); *Buckalew v. City of Grangeville,* 97 Idaho 168, 170, 540 P.2d 1347, 1349 (1975).

heard in person and to present witnesses and documentary evidence, (5) a neutral and detached hearing body, and (6) a written statement by the fact finders as to the evidence relied upon." Appellant's Brief, p. 59. We cannot agree.

The Supreme Court's opinion in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), makes it clear that a full pretermination hearing is not required in every case where a public employee is dismissed. In *Arnett,* a civil service employee was discharged under a detailed statutory and regulatory procedure, which required that an employee be given advance notice of his removal and the charges against him, but which did not provide for a full evidentiary hearing until on appeal from the decision. Like Mr. Allen, Mr. Kennedy challenged the constitutionality of his discharge on the ground that he was not afforded a full evidentiary hearing prior to his dismissal. A plurality opinion written by Justice Rehnquist and joined by Chief Justice Burger and Justice Stewart, approved the procedure in *Arnett* on the theory that an employee whose right to continued employment arose out of the statutes and regulations at issue could not assert the right to such continued employment without also accepting the procedures provided by the statutes and regulations to govern that right. 416 U.S. at 154–58, 94 S.Ct. at 1644–46. Although six members of the Court rejected Justice Rehnquist's approach, *see* 416 U.S. at 211, 94 S.Ct. at 1672 (Marshall, J., dissenting), two other justices agreed that under the facts of the case a post-termination evidentiary hearing provided Kennedy all process that was due. Justice Powell, concurring in part and joined by Justice Blackmun, stated that the form of hearing required by due process depends "on a balancing process in which the Government's interest in expeditious removal of an unsatisfactory employee is weighed against the interest of the affected employee in continued public employment." 416 U.S. at 167–68, 94 S.Ct. at 1651. Although there were several separate opinions filed in *Arnett v. Kennedy,* the United States Supreme Court and the lower federal courts have consist-

ently followed the reasoning of the separate opinion written by Justice Powell in *Arnett.* See *Tupper v. Fairview Hospital and Training Center,* 276 Or. 657, 556 P.2d 1340, 1343 n. 1 (Or.1976), and cases cited therein. Thus, in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), after reviewing its prior due process cases, the Court employed a balancing test to determine the requirements of due process and concluded that "an evidentiary hearing is not required prior to the termination of disability benefits ...." 424 U.S. at 349, 96 S.Ct. at 910. The Court stated:

"These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical concept with a fixed content unrelated to time, place and circumstances.' ... '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' ... Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy, supra,* 416 U.S. [134], 167–68, 94 S.Ct. [1633], 1650–51 [40 L.Ed.2d 15] [(1974)] (Powell, J., concurring in part). More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; Second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

424 U.S. at 334–35, 96 S.Ct. at 902–03. See *Bowler v. Board of Trustees,* 101 Idaho 537, 542, 617 P.2d 841, 842 (1980). Accordingly, to determine whether the procedures provided in this case provided the necessary due process protections, we must consider the factors set forth above in *Mathews.*

The private interest to be considered in this case is Mr. Allen's expectation of continued employment as chief of campus security until June 30, 1978.[7] Mr. Allen's position was a part-time job for which he was to receive an annual salary of $3,182. Since Mr. Allen had been paid through September 30, 1978 (approximately one-fourth of his salary) and he retained his position at LCSC as a full-time instructor in the police officer training program, there was relatively little adverse economic impact on Mr. Allen. Certainly, Mr. Allen's discharge cannot be said to have created a situation of "brutal need," such as caused the Supreme Court in *Goldberg v. Kelley*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), to hold that an evidentiary hearing is necessary prior to the termination of welfare benefits. However, in addition to Mr. Allen's economic interest, Mr. Allen had an interest in avoiding a loss of reputation which may result in cases in which an employee is discharged for unjustifiable reasons.

LCSC's interest in this case is that of maintaining the efficiency and discipline among its employees. The nature and extent of this interest was articulately described by Justice Powell in his separate opinion in *Arnett, supra:*

"In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise un-satisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial."
416 U.S. at 168, 94 S.Ct. at 1651 (footnote omitted).

Mr. Allen had the responsibility of maintaining order on campus at LCSC. During a time of controversy over security personnel bearing guns, his statements and conduct inexcusably broadened the controversy into racial-social areas and caused adverse reactions on campus and in the community. Accordingly, we believe that there was a strong governmental interest in the prompt discharge of Mr. Allen.

Finally, we must consider the risk that an erroneous deprivation would result from the procedures employed and the probable value of the additional safeguards to which Mr. Allen argues he was entitled. Since the State Board of Education's Personnel Policies do not specifically define the procedures to be followed in the case of the dismissal of a nonfaculty, nonclassified employee, the procedures we review today are the procedures which were followed in this particular case, and our decision is limited accordingly.

Pursuant to Section 513.59 of the Personnel Policies, the responsibility of determining whether good cause existed for Mr. Allen's discharge rested with President Vickers.[8] Prior to making his initial decision to discharge Mr. Allen, President Vickers met with him for approximately twenty to thirty minutes, discussing the problem

---

**7.** A term of Mr. Allen's one-year contract was: "Employee should not expect employment beyond the period of this appointment; ...." *See* note 4, *supra.* Thus, Mr. Allen has argued that he had "an expectation of employment until the end of the term of the contract," Appellant's Brief, p. 65, and has not suggested that he had an expectation of employment beyond that date.

**8.** Section 513.59 provides:
"Dismissal ... of ... nonteaching personnel before the expiration of the stated period of appointment or employment will be only for good cause shown, as determined by appropriate administrative officers to whom this responsibility is delegated by the chief administrative officer of the institution and in case of such dismissal ... any appeal shall

that had been created by Mr. Allen's statements and conduct and recommending a solution—an apology by Mr. Allen. Although Mr. Allen was not specifically informed in writing at that time of the charges against him or the reasons for his potential dismissal, he was certainly given some forewarning of the reasons for his impending dismissal and some opportunity to respond. Mr. Allen was informed of his right to appeal President Vickers' decision and a faculty hearing board was convened to make a recommendation on the matter.[9] President Vickers reviewed his initial decision after receiving the board's recommendation, but rejected it.[10] Thereafter, Mr. Allen was granted the right to appeal President Vickers' decision to the State Board of Education. Although the Board reviewed the matter in an appellate capacity, the matter was reviewed de novo, with a full evidentiary hearing being provided to Mr. Allen before the Board's hearing officer Michael McNichols—a hearing which Mr. Allen concedes was "full and fair."

Although it may not be true in other situations, we believe that in this case the procedures followed left little risk that an erroneous deprivation would result, and further, that the additional safeguards to which Mr. Allen argues he was entitled—essentially a full evidentiary hearing prior to termination—would have been of limited value. In this case President Vickers, the person to whom the responsibility of determining cause had been delegated,[11] based his determination of good cause upon facts which were basically undisputed. This was not a case in which issues of witness credibility and veracity were critical to the decisionmaking process. See Mathews, supra, 424 U.S. at 343–44, 96 S.Ct. at 907. The question in this case was simply whether the facts constituted good cause for dismissal, a decision which generally rests exclusively within the competence of the administrative official or body assigned to make such a determination.

■ Having considered the competing interests of the parties and the reliability of

---

be reviewed by the chief administrative officer of that institution."
Mr. Allen, as chief of campus security, worked directly under President Vickers and the responsibility for determining cause for his dismissal had not been delegated to any other administrative officer. Accordingly, the authority to determine whether cause existed remained with the president of LCSC, Dr. Vickers, subject to the ultimate authority of the State Board of Education.

9. Mr. Allen received a letter of termination from President Vickers on September 12, 1978, stating that his dismissal was effective as of September 11, 1978. This letter informed Mr. Allen in general terms of the reasons for his dismissal and also informed him of his right to appeal his dismissal. Thereafter, Mr. Allen notified President Vickers of his intent to appeal. Since LCSC had no procedures governing the review of a dismissal of a nonfaculty nonclassified employee (and there are no specific procedures in the Personnel Policies), President Vickers proposed a faculty hearing board modeled after the LCSC Administrative Hearing Board, the board to make recommendations only. In his letter proposing the faculty hearing board, President Vickers stated:
"As you are aware, conclusions of all internal institutional hearing boards are considered as recommendations only, subject to consideration of the institutional President. Once I

have reviewed the recommendations of the hearing board, I will evaluate them along with the other available information and inform you of my decision. If you are not in accord with these procedures please notify me before Friday, September 29, 1978."
No objection was interposed and the board was constituted as proposed.

10. Although the faculty hearing board was offered by President Vickers as an additional safeguard of Mr. Allen's interests, the hearing before the board was of questionable value since, as noted in the Board's findings: "The Hearing Panel made no record of the proceedings before it; made no documentation of evidence by it received; and upon resolution issued a pure conclusion unsupported by any Findings of Fact based upon evidence or proceedings before it." However, like the Board, we believe that although there may have been irregularities connected with the faculty hearing board, "nothing resulting therefrom or thereby affected the procedural or substantive rights of the appellant, HERBERT ALLEN, or the rights of Lewis-Clark State College."

11. The State Board of Education, in its capacity as the board of trustees of LCSC, has the statutory authority to remove employees of that institution in accordance with the Board's policies and rules. See I.C. sections 33–3102 and –3106.

the procedures followed in this case, we conclude that a full evidentiary hearing was not required prior to Mr. Allen's discharge by President Vickers and that the procedures followed in this case, which included de novo review by the State Board of Education and its hearing officer, fully comported with due process. *See Mathews, supra* (holding that an evidentiary hearing is not required prior to termination of disability benefits and that the administrative procedures for such termination, which included de novo review of a state agency decision before a Social Security Act administrative law judge, fully comport with due process); *Arnett, supra* (providing that due process does not require a pretermination evidentiary hearing in all cases and that appellant's rights were adequately protected by pretermination hearing procedures); *Barrett v. Smith,* 530 F.2d 829 (9th Cir.1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2179, 48 L.Ed.2d 801 (1976) (holding that police officer who was dismissed for violations of departmental rules and regulations was not entitled to a pretermination hearing under the due process clause); *Bignall v. North Idaho College,* 538 F.2d 243 (9th Cir.1976) (holding that college instruction discharge without a pretermination hearing was permissible and that a de novo evidentiary hearing before the district court provided the appellant with the complete panoply of procedural rights); *Peacock v. Board of Regents,* 510 F.2d 1324 (9th Cir.1975), *cert. denied,* 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 701 (holding that suspension of a professor, who was also a department head, pending a hearing, was permissible, because the totality of the circumstance established the constitutional adequacy of the post-deprivation review available to appellant); *Brubaker v. Board of Education, School District No. 149,* 502 F.2d 973, 985 (7th Cir.1974) (holding that Constitution does not require that a hearing precede the termination of a public employee and that appellants' due process rights were not violated where their dismissals were sustained after plenary administrative and judicial hearings); *Davis v. Vandiver,* 494 F.2d 830 (5th Cir.1974) (holding that procedure followed in discharging an air national guard

technician comported with due process where technician was afforded full evidentiary hearing after his termination); *Magri v. Giarrusso,* 379 F.Supp. 353 (E.D.La.1974) (holding that procedural due process did not require that a police officer be granted a pretermination hearing and that the police officer's rights were not violated where he was afforded a full evidentiary hearing on appeal). Accordingly, we hold that Mr. Allen was not dismissed in violation of his right to due process.

The judgment of the district court is affirmed. Costs to respondents. No attorney's fees awarded.

DONALDSON, C.J., and SHEPARD, BAKES and HUNTLEY, JJ., concur.