675 P.2d 33

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Thomas Henry GIBSON,
Defendant-Appellant.**

**No. 14425.**

Supreme Court of Idaho.

Dec. 15, 1983.

Rehearing Denied Feb. 14, 1984.

**56**

Michael J. Vrable, Coeur d'Alene, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Larry K. Harvey, Chief Deputy Atty. Gen., Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal from a conviction of first degree murder and from the sentence of death imposed upon that conviction, together with our review of the death sentence pursuant to I.C. § 19–2827. We affirm.

The circumstances surrounding the crime are largely without challenge except as to the location of and who did the actual killing. Some of the most damaging testimony came from the defendant Gibson himself who testified at trial. Gibson was charged with the first degree murder of Kimberly Ann Palmer. Palmer and a friend, Scott Currier, were in Spokane, Washington, where Currier had met members of a motorcycle group. On June 19, 1980, Palmer and Currier left for a camping trip in a blue and white van. On Friday, June 20, Currier and Palmer checked into a Spokane motel which was located a short distance from the residence of Donald Paradis; they immediately checked out of the motel, with Currier stating that his guns had been stolen, that he knew who

did it, and that he was going to retrieve them.

Gibson testified that in the early morning hours of June 21, he, Paradis, and Larry Evans, among others, were at the Paradis residence when Currier and Palmer arrived. A fight erupted and Gibson testified that he watched Paradis beat Currier to death with a baseball bat. Gibson testified that he left for a short time, and upon returning found Currier lying on the floor dead or dying. Gibson testified that he saw Kimberly Palmer running out of the house and "as she ran by me I grabbed her, pulled her down to the floor and hit her and knocked her out" because he was afraid she would be calling for help. Gibson testified that he then moved Palmer to the kitchen, put her on the floor, took her pulse, determined that she was still alive, and related that to Larry Evans and that Evans then choked Palmer to death. Gibson testified that he watched the choking and thereafter determined that Palmer was dead.

Gibson testified that he and another then placed Currier's body in a blue sleeping bag while Paradis and Evans placed the Palmer body in a red sleeping bag. The bodies were then placed in the blue and white van, which was driven to a remote area just outside of Post Falls, Idaho. Other testimony indicated that at approximately 6:30 a.m. thàt Saturday morning, the blue and white van was observed driving up a steep mountain road in a sparsely populated area south of Post Falls, Idaho. Two or three men were in that van, one of whom was wearing a distinctive cap. Gibson testified that the blue and white van stalled going up a hill, rolled backwards and overturned. Gibson stated that he stayed in the van while Paradis moved the body of Kimberly Palmer and Evans moved the body of Scott Currier. The van was then pushed over, abandoned, and Gibson, Paradis and Evans walked back to Post Falls. Gibson stated that he was carrying a rifle rolled up in a blue blanket.

Other testimony placed three men of the general description of Gibson, Paradis and

Evans walking down that road toward Post Falls, Idaho that same morning. The men were all strange to the area and one was carrying a rolled up blue blanket. Three men of the same description were observed entering Post Falls that morning, and they were questioned by the police in Post Falls. One of those men was identified as Gibson and he was carrying a rolled up blue blanket. Another of the three was identified as Paradis.

Later that day, the blue and white van was seen turned on its side with debris scattered about just off that mountain road. Upon investigation, the body of Kimberly Palmer was found face down in a small stream nearby and the body of Scott Currier was found inside a sleeping bag. Currier's body was bound with pieces of terrycloth and had been bleeding. A distinctive belt buckle worn by Currier had been cut off. Palmer was found to have been strangled to death.

In the early morning hours of Sunday, June 22, the Paradis residence in Spokane was severely damaged by a fire caused by arson. In the basement of that house was found a rolled up rug, in which were found Currier's missing belt buckle, a lawn dart with traces of blood which matched puncture wounds in Currier's back, and a piece of blue terrycloth which matched the terrycloth found with the body of Currier.

On Monday, June 23, Gibson and a friend left the area; they were apprehended in northern California on June 25. Gibson gave a false statement to California authorities before being returned to the State of Washington where he was charged with the murder of Scott Currier. Following trial, he was acquitted of that charge and extradited to Idaho for the murder of Kimberly Palmer.

At trial, a major issue was raised concerning Idaho's jurisdiction over Gibson and, therefore, much of the State's case consisted of autopsy evidence which showed that the varying state of body decomposition indicated that Currier had been killed some hours before Palmer, and water in Palmer's lungs indicated that Palmer

had actually been killed in the streambed in Idaho. That evidence, of course, contradicted the testimony of Gibson that Palmer had been killed in the Paradis' residence in the State of Washington.

Gibson asserts that at the preliminary hearing stage the information should have been dismissed for lack of probable cause, citing I.C.R. 5.1(c):

"If from the evidence the magistrate does not determine that a public offense has been committed or that there is not probable or sufficient cause to believe that the defendant committed such offense, the magistrate shall dismiss the complaint and discharge the defendant."

The standard of review for probable cause findings at the preliminary hearing stage was stated in *State v. Owens,* 101 Idaho 632, at 636, 619 P.2d 787, at 791 (1979):

"At the preliminary hearing the state is not required to prove the accused's guilt beyond a reasonable doubt; it need only prove that a crime was committed and that there is probable cause to believe the accused committed it. [Citations]. The decision of a magistrate that there exists probable cause to bind a defendant over to district court for trial on the charges should be overturned only on a showing that the committing magistrate abused his discretion."

It is also stated that probable cause exists when the court has before it "such evidence as would lead a reasonable person to believe the accused party has probably or likely committed the offense charged." *Carey v. State,* 91 Idaho 706, at 709, 429 P.2d 836, at 839 (1967); *Martinez v. State,* 90 Idaho 229, at 232, 409 P.2d 426, at 427 (1965).

■ Without reciting the testimony, it is sufficient to state that the evidence produced by the State at the preliminary hearing established that a crime had been committed and a reasonable person would believe that Gibson had probably or likely participated in the commission of the offense charged. We find no abuse of the discre-

tion of the magistrate in his finding of probable cause.

■ At one point in time, Gibson was represented by the office of public defender for a period of approximately ten days, but during that time no member of that office so much as contacted Gibson. A member of that public defender's office joined the Kootenai County Prosecutor's Office during the time that it was prosecuting Gibson. That attorney was ordered by the prosecutor's office and by the trial court to speak to no one in the prosecutor's office regarding the Gibson case and that attorney faithfully maintained the silence. Nevertheless, Gibson asserts that the mere *appearance* of impropriety is sufficient to require reversal. We disagree. Gibson has failed to even allege, much less show, any actual prejudice. *Annau v. Schutte,* 96 Idaho 704, 535 P.2d 1095 (1975); *see State v. Hobbs,* 101 Idaho 262, 611 P.2d 1047 (1980); *State v. Wolfe,* 99 Idaho 382, 582 P.2d 728 (1978); *Mahaffey v. State,* 87 Idaho 233, 392 P.2d 423 (1964). *See also Young v. State,* 297 Md. 286, 465 A.2d 1149 (1983).

Gibson asserts that the trial court should have excluded a statement made by him to a California district attorney since there was no compliance with I.C. § 19–853 in the obtaining of that statement. I.C. § ·19–853, in essence, requires that *Miranda* warnings under certain circumstances be given in writing or otherwise recorded and that the person questioned acknowledge in writing that he has received the *Miranda* warnings. There is no contention that Gibson did not receive the *Miranda* warnings or that the actions of the California authorities did not comport with constitutional standards set forth by the United States Supreme Court.

Hence, we restate the issue: should an Idaho court exclude from evidence a statement taken in another jurisdiction admittedly in compliance with the United States constitutional standards but not obtained in compliance with an Idaho statute?

The major purpose behind the exclusionary rule is to assure that police act proper-

ly in obtaining evidence from suspects by removing the incentive to do otherwise. *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); E. CLEARY, McCORMICK ON EVIDENCE § 166 (2d ed. 1972).

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Peltier, supra,* 422 U.S. at 539, 95 S.Ct. at 2318; *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

It has also been stated that the Court would "simply decline to extend the court-made exclusionary rule to cases in which its deterrent purpose would not be served." *Desist v. United States,* 394 U.S. 244, 254 n. 24, 89 S.Ct. 1030, 1036 n. 24, 22 L.Ed.2d 248 (1969); *see also United States v. Calandra, supra; Michigan v. DeFillippo, supra; United States v. Peltier, supra.*

■ In the instant case, the California authorities acted validly within the constraints of the United States Constitution and, insofar as we are informed, followed the laws of their jurisdiction. We find no basis to assume that excluding probative evidence validly obtained by the California authorities in their jurisdiction would deter their future conduct or the conduct of their counterparts in other jurisdictions. Put simply, in a case of this type, there is no rationale whatever for the application of the exclusionary rule and since we deal

here with the asserted violation of a state statute rather than a violation of a constitutional right, we refuse to invoke the exclusionary sanction to the statements made to the California authorities.

■ Gibson next asserts that the trial court erred in admitting evidence connecting Gibson with the death of Scott Currier since it constituted evidence of another crime for which appellant was not on trial. Generally, evidence of other crimes of a defendant is not admissible at trial to show the criminal propensity of the defendant. *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978). Evidence of other crimes may be introduced, however, if that evidence falls within one of the generally recognized exceptions to the general rule.

"However, this jurisdiction will admit evidence of defendant's past criminal activity to prove: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, (5) the identity of the person charged with the commission of the crime on trial, and (6) other similar issues." *State v. Needs, supra* 99 Idaho at 892–3, 591 P.2d at 139–40.

■ In the instant case, the evidence of the Currier death was not presented for the purpose of showing Gibson's criminal propensity, but rather for the purpose of showing motive and common scheme, and to present, as stated by the trial judge, a "rational and cohesive scenario," which uses are permissible. *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975); *State v. Dayley,* 96 Idaho 527, 531 P.2d 1172 (1975); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. denied* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971).

Gibson argues, nevertheless, that the "other crime" rule differs in this case since the evidence being introduced related to a crime for which Gibson had been acquitted. We disagree. *See, e.g., Hernandez v. United States,* 370 F.2d 171 (9th Cir.1966); *Buatte v. United States,* 350 F.2d 389 (9th Cir.1965) *cert. denied,* 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966); *Ladd v. State,* 568 P.2d 960 (Alaska 1977) *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *People v. Vaughn,* 71 Cal.2d 406, 78 Cal.Rptr. 186, 455 P.2d 122 (1969); *People v. Douglas,* 246 Cal.App.2d 594, 54 Cal.Rptr. 777 (1966); *Davis v. State,* 277 So.2d 311 (Fla.Ct.App.1973); *Jenkins v. State,* 147 Ga.App. 21, 248 S.E.2d 33 (1978); *State v. Darling,* 197 Kan. 471, 419 P.2d 836 (1966); *People v. Bolden,* 98 Mich.App. 452, 296 N.W.2d 613 (1980); *State v. Schlue,* 129 N.J.Super. 351, 323 A.2d 549 (1974); *State v. Yormark,* 117 N.J.Super. 315, 284 A.2d 549 (1971); *State v. Smith,* 271 Or. 294, 532 P.2d 9 (1975); *State v. Tarman,* 27 Wash.App. 645, 621 P.2d 737 (1980). *See also,* Annot., Admissibility of evidence as to other offense as affected by defendant's acquittal of that offense, 86 A.L.R.2d 1132 (1962).

In the instant case, Gibson has not been charged with the murder of Scott Currier. Hence, we are not required to decide whether Gibson could be charged by a different sovereign, Idaho, for a crime committed in its jurisdiction for which he had previously been acquitted in Washington. Rather, Gibson stands charged with the murder of Kimberly Palmer in Idaho. Hence, the double jeopardy clause of the Fifth Amendment to the United States Constitution is not specifically applicable to the case at bar. Nevertheless, it is argued that the attendant collateral estoppel rule under *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), precludes the trial of Gibson since the ultimate issue has already necessarily been determined at a previous trial. We disagree.

In *Ashe,* the defendant had been charged with robbing one of six people who were engaged in a poker game. He was acquitted of robbing that one participant and acquitted. Thereafter, he was charged and convicted of robbing a second participant. It was held that the acquittal of robbing the first participant necessarily established that he was not the gunman at the holdup

and hence could not be convicted for robbing the second participant.

The *Ashe* rationale is clearly distinguishable from the case at bar. Gibson's acquittal of murdering Scott Currier in the State of Washington does not necessarily establish that he did not participate in the murder of Kimberly Palmer in Idaho. The Washington jury in the Currier trial could have acquitted Gibson on any of a number of defenses, including lack of jurisdiction. On the other hand, the Idaho jury in the Kimberly Palmer trial could well have believed on the evidence submitted that, while someone else killed Currier, Gibson prevented Kimberly Palmer's escape from the scene of the Currier murder, beat her unconscious, transported her into Idaho and there participated in her murder. *See King v. Brewer,* 577 F.2d 435 (8th Cir. 1978).

■ Regardless of Gibson's guilt or innocence of Currier's murder, the evidence of that death is highly relevant as a motive for Gibson's participation in the murder of Palmer. Hence, the doctrine of collateral estoppel did not preclude introduction of the evidence of Currier's death during the trial of Gibson for the murder of Palmer.

Gibson next asserts prosecutorial misconduct in the calling of one Colis to the stand during Gibson's trial. We disagree. The State called Colis as a witness, who stated his name and address. He then was asked if he owned any kind of a vehicle. Before Colis could answer, an attorney representing Colis, introduced himself and stated that he had discussed the matter with Colis. At that point, upon the request of Gibson's attorney, the jury was excused. It was only after the jury left the courtroom that Colis' attorney informed the court that he was instructing Colis to invoke the Fifth Amendment and refuse to answer any questions. Colis affirmed that he was invoking the Fifth Amendment privilege. At that point, the State offered to extend immunity to Colis and offered to obtain a grant of immunity from the State of Washington. The court held that the State could not show Washington had ex-

tended immunity to Colis, therefore, Colis was allowed to invoke the Fifth Amendment. Colis was then dismissed and the jury recalled and instructed that they were not to draw or make any inference or draw any conclusion concerning the appearance of Colis.

■ It is asserted that those facts merit reversal of the conviction of Gibson under a standard set forth in *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). We disagree. In *Namet* it was stated that when the prosecution calls a witness knowing that the witness would invoke the Fifth Amendment and refuse to testify, no constitutional question is involved, but merely a claim of evidentiary trial error, and that such claim of error would have to be based either upon a "conscious and flagrant attempt" of the prosecutor to build his case upon inferences arising from that refusal to testify or a showing that "inferences from a witness' refusal to answer added critical weight to the prosecutor's case in a form not subject to cross examination and thus unfairly prejudiced the defendant." At pp. 185–187, 83 S.Ct. at 1154–1155. Here, neither of the two prongs of *Namet* are applicable.

Gibson admits the prosecutor made no "conscious and flagrant attempt" to build his case upon impermissible inferences and the record is clear that the appearance of Colis added no "critical weight" to the prosecution's case. *See Douglas v. State of Alabama,* 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965); *Cota v. Eyman,* 453 F.2d 691 (9th Cir.1971), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2054, 32 L.Ed.2d 338 (1972). Here, the jury saw Colis only identify himself. It can hardly be said that testimony or presence added "critical weight" or any weight to the case of the prosecution.

As above indicated, the jury was not present when Colis invoked the Fifth Amendment privilege. *See United States v. Edwards,* 366 F.2d 853 (2d Cir.1966), *cert. denied,* 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967). We further note that when the jury reentered the courtroom,

they were instructed, "You are not to draw or make any inference or draw any conclusion concerning the appearance of Mr. John V. Colis in this courtroom." Hence, even assuming that Gibson was somehow prejudiced by the mere appearance of Colis in the courtroom, it was dissipated by the court's instruction. *See Namet v. United States, supra; United States v. Edwards, supra.*

■ Gibson also asserts that the trial court erred in its failure to give the circumstantial evidence instruction approved in *State v. Holder,* 100 Idaho 129, 594 P.2d 639 (1979). Here the record indicates that the court adequately instructed the jury pursuant to the *Holder* requirement, albeit at the beginning of the trial. We find no error. We further note that the *Holder* ruling is required when "the evidence linking the defendant with the [crime] was entirely circumstantial." *Holder* at 133, 594 P.2d at 643. Here the evidence was far from "entirely circumstantial." We find no error.

■ Gibson argues that during the closing argument the prosecutor made two improper remarks which require the reversal of the conviction. First, the prosecutor utilized a "link in a chain" argument stating that all of the other links had performed their duties and it was now time for the jury to perform its duty. We find no error. *See State v. Larsen,* 81 Idaho 90, 99, 337 P.2d 1, 6 (1959); *Horn v. State,* 176 Ind.App. 527, 376 N.E.2d 512 (1978); *Fulgham v. State,* 386 So.2d 1099 (Miss.1980); *see also Sparks v. State,* 161 Tex.Cr.R. 100, 275 S.W.2d 494 (1955).

Error is also asserted in the prosecutor making reference to Gibson's silence during his trial for Scott Currier's murder in Washington, *i.e.,* "It's very strange that we have waited until a year has gone by, that the defendant has already been once in jeopardy in the State of Washington and acquitted, and then now he wants to tell the whole story, that of course he says [both murders] happened over there [in Washington]. Why didn't he say this a year ago?" The general rule governing such remarks is stated in *State v. Hodges,* 105 Idaho 588, 671 P.2d 1051 (1983):

"It is clearly erroneous for a prosecutor to introduce evidence of the defendant's postarrest silence for the purpose of raising an inference of guilt.... It is likewise erroneous for a prosecutor to comment to the jury on the defendant's failure to testify at trial."

Nevertheless, that general rule is otherwise when the defendant himself takes the stand. As stated by the United States Supreme Court, "[t]he interests of the other party in regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Jenkins v. Anderson,* 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980); *Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958).

In *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), which was relied upon and reaffirmed in *Jenkins, supra,* it was held that once a defendant takes the stand in a second trial, after remaining silent in his first trial, he may be cross examined as to why he remained silent in the prior trial, his waiver of his Fifth Amendment right to remain silent is total, and the permissible scope of cross examination is bounded only by the applicable rules of evidence. *Jenkins, supra,* reaffirmed that, having waived his Fifth Amendment right to remain silent by taking the stand, a defendant in a state trial may be impeached by his silence in accordance with that state's applicable rules of evidence. Under the standards set by *Raffel* and *Jenkins,* it is permissible to impeach a defendant regarding his earlier silence if the defendant takes the stand. However, we need not base our decision upon *Raffel* and *Jenkins* here Gibson not only took the stand, but commented upon his earlier silence. The rule under these circumstances has been stated:

"The rule would seem to be well settled that where a defendant in a criminal trial

voluntarily takes the witness stand in his own behalf he is subject to the same rules applicable to other witnesses and may be cross-examined in regard to all matters to which he has testified on his direct examination or connected therewith." *State v. Larsen,* 81 Idaho 90, 99, 337 P.2d 1, 5, 6 (1959); *State v. Hargraves,* 62 Idaho 8, 19, 107 P.2d 854, 858 (1940).

Once Gibson himself commented upon his earlier silence, he was subject to prosecutorial cross-examination and comment upon that testimony. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Bontempo v. Fenton,* 692 F.2d 954 (3d Cir.1982), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983).

Gibson next asserts that the imposition of the sentence of death is unconstitutional since here it was imposed by a judge rather than a jury. Our late cases of *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), and *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), are dispositive of this question.

Gibson next asserts that the trial court in its sentencing procedure failed to comply with I.C. § 19–2515, and that those failures of the trial court mandate resentencing. We disagree. Gibson asserts that the trial court improperly weighed the mitigating and aggravating circumstances in that the court grouped mitigating circumstances into categories, *i.e.,* "lack of previous felony convictions," "age," "military record," etc., and determined within each category whether there were sufficient circumstances to mitigate the actions of Gibson. That assertion misstates the facts. Gibson filed with the court a "pre sentencing statement" in which *he* listed eight items which he contended should be considered as mitigating: 1)a) "Lack of previous felony convictions; b) Age–30; c) Military Record; and d) Family background. 2) Defendant's trial testimony; 3) Polygraph Examination; 4) Testimony of C. Gordon Edgren, M.D., FAPA; 5) Testimony of Cal Henderson."

Each of those factors set forth by the defendant were examined by the trial court and the court discussed why each, in turn, should or should not be considered mitigating. The trial court then also considered factors not listed by the defendant which could possibly be considered as mitigating. After considering each of those possible mitigating circumstances, the trial court determined, in its findings

"in considering death penalty under section 19–2515, Idaho Code, the court has found one mitigating circumstance, to-wit: the fact that the defendant has no substantial prior criminal record. However, the court does not find that such mitigating factor outweighs the gravity of the aggravating circumstance found."

The trial court properly enumerated and considered mitigating circumstances as required by I.C. § 19–2515, and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

Gibson next asserts that the trial court erroneously, under I.C. § 19–2515, improperly held his silence against him in considering whether Gibson's cooperation with police should be considered as mitigating. Again, that assertion misstates the actions of the trial court. The court merely found that there was nothing mitigating in the way Gibson dealt with the police since he found there was no evidence that Gibson had cooperated with the police. There was no showing that Gibson's silence in the Currier murder trial was held against him in the sentencing process.

Gibson next asserts that the trial court erroneously found that Gibson "aided and abetted in the killing of Kimberly Ann Palmer in a very direct manner." Although Gibson argues that the evidence does not support the finding, we disagree. Gibson's own testimony clearly established that he very directly aided and abetted in the murder of Palmer. As noted previously, the jury was free to accept any part of Gibson's testimony as true and any part of it as false. *Lono v. State,* 63 Hawaii 470, 629 P.2d 630 (1981); *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied,* 455

U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). The jury could, and apparently did, believe that Gibson beat Palmer unconscious and participated in her transportation to the scene of the murder in Idaho where she was strangled to prevent her from telling of the murder of Scott Currier. Whichever version of the evidence the jury chose to believe, it is clearly established therein that Gibson intended that Kimberly Palmer die.

█ Gibson next asserts that persons who are mere aiders and abettors in a killing may not suffer the death penalty. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), clearly indicates that the death penalty is not an unduly severe punishment for an aider and abettor to a murder when that person *intends* that a killing take place. As above noted, there can be no doubt from the evidence that Gibson intended that Kimberly Palmer be killed in order to conceal the circumstances of the death of Scott Currier.

I.C. § 19–2827 requires that we now conduct an independent review of this cause and examine the total proceedings in the trial court to ensure that the sentence of death was imposed without resort to passion or prejudice or any other arbitrary factor, that the evidence supports the trial court's findings of aggravating circumstances, and that the sentence of death is not excessive or disproportionate.

█ We find that all of the procedures mandated in potential death penalty cases were followed. Gibson was in attendance at the pronouncement of sentence and written findings of the trial judge on aggravating and mitigating circumstances were made. Gibson was given notice that the State intended to ask for the death penalty and was given notice of the State's intent to rely on the aggravating circumstances set forth in I.C. § 19–2515(f)(6)–(8), and (10). Gibson was allowed to submit a document to the court setting forth what Gibson felt were the mitigating circumstances that should be considered, and that document and its contents were considered by the trial court. An aggravation/mitigation hearing was held, evidence was taken, and arguments heard thereon. The trial court issued written findings setting forth the mitigating factors he considered and the aggravating factors he found beyond a reasonable doubt. One mitigating circumstance was found, *i.e.,* the lack of significant previous criminal convictions, and that circumstance was weighed against the aggravating circumstance and found insufficient to stay the death penalty. We find no error.

█ I.C. § 19–2827 requires us to conduct a review of the sentence imposed in this case in comparison with the sentences imposed in similar cases to ensure that the sentence in the instant case was not excessive or disproportionate. We recently in *State v. Creech, supra,* conducted an extensive review of Idaho murder cases. We find that the sentence imposed in the instant case is not disproportionate to the sentence imposed in those cases reviewed in *Creech* where the death sentence was available as a form of punishment. We also have compared the instant case with our recent death penalty cases in *State v. Creech, supra,* and *State v. Sivak, supra,* and find that the sentence imposed in the present case is not disproportionate to the sentences imposed in those cases. We note that the murder committed in the instant case is similar to that committed in *State v. Sivak, supra,* in that in *Sivak* the trial court found that one of the reasons the victim was killed was to ensure the silence of the victim and prevent her from identifying the defendant as the perpetrator of the robbery. In the instant case, the trial court identified the motive for killing Kimberly Palmer as insuring her silence about the circumstances surrounding the murder of Scott Currier. We find the death penalty imposed in the instant case to be both proportionate and just.

The judgment of conviction and the sentence of death are affirmed.

DONALDSON, C.J., and BAKES, J., concur.

**64**

HUNTLEY, Justice, concurring specially.

I concur in the majority opinion with the caveat and reservation that I remain of the opinion that the Idaho capital sentencing process is unconstitutional in two respects:

(1) It does not provide for utilization of the jury, which violates both the Idaho and United States constitutions; and

(2) The sentencing proceeding, as conducted by the trial courts with the approval of this court, deprives the accused of the right to cross-examine and confront witnesses at the sentencing hearing and permits the admission of the presentence investigation report and other hearsay evidence.

My reasoning in this regard is set forth in detail in my dissenting opinions in *State of Idaho v. Creech*, 105 Idaho 463, 670 P.2d 463 (1983), and *State of Idaho v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).

BISTLINE, Justice, dissenting.

## I.

### Constitutionality of the Sentencing Under the Idaho Constitution

Not in *Creech*,[1] not in *Sivak*,[2] and again not in *Gibson*, has the State presented any argument and authority to refute the considered and substantiated views of Justice Huntley and myself that a defendant convicted of first degree murder in Idaho is possessed of a right guaranteed by the Idaho Constitution to have a jury determine whether he shall live or die. While it is true that Justice Bakes attempted a refutation in his *Sivak* opinion, it did not meet the documented history which establishes that at the time of the adoption of our Idaho Constitution, and thereafter until the advent of *Furman*, a jury of a defendant's peers made the awesome decision. The views of Justice Bakes are always entitled

to considerable deference, but in this particular area it seems abundantly clear that the Justice simply has declined to have a head-on confrontation with history. At some point in time it behooves the State to address the issue. At the present time it is apparently content to ride on the coattails of the Court's *Sivak* opinion. As I have said before, the High Court's intervention in the death penalty area of state law, while it may have been needed in some of the southern states, as mentioned just recently in the oral argument of the Attorney General in the *Aragon*[3] case, was not needed in Idaho, the net result being the legislature's passage of a statutory scheme that did not conform to the Constitution. The legislature, of course, can correct the situation and cure this Court's inaction. Meanwhile Justice Huntley and I remain unable to join any opinion of the Court's where a jury has not been the sentencer.

## II.

### Proportionality

Recent cases from the High Court make it abundantly clear that the Court has decided to abandon the field, and has just about completed its evacuation. The *State of Louisiana v. Williams* is about to play out its last act in a drama extending ten years. *Maggio, Warden v. Williams*, —— U.S. ——, 104 S.Ct. 311, 78 L.Ed.2d 43 (1983). With that opinion the High Court erased any requirement of statewide proportionality, which issue of proportionality is about all that remains of the High Court's prestigious opinions of the seventies in death penalty cases. Proportionality may well be discarded altogether in *Pulley v. Harris*, review granted in 460 U.S. 1036, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983), to examine the challenge that "the California Supreme Court in *Pulley* had wholly failed to compare applicant's case with other cases to determine whether his death sen-

---

1. *State v. Creech*, 105 Idaho 463, 670 P.2d 463 (1983).

2. *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).

3. *State v. Aragon*, Supreme Court No. 14771.

tence was disproportionate to the punishment imposed on others." *Maggio v. Williams*, —— U.S. at ——, 104 S.Ct. at 314. But, however the High Court's opinion in that case may go,[4] it should little affect the conducting of the business of this Court in the area of proportionality. The Idaho legislature in directing our automatic review of death penalty sentences, I.C. § 19–2827, amongst other provisions, requires that this "court shall determine ... (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

In *Sivak* it was appropriate for this Court to compare his sentence with that of *Bainbridge*, his co-defendant who was by some unexplained mishap accorded a separate trial. (The sentences were death to Sivak, life for Bainbridge—both convicted of first degree murder for killing the same woman.) The Court did not do so, however. In *Creech* it was in order for the Court to compare his sentence with the recent similar cases of *Osborn II*[5] and *LePage*.[6] The Court did not do so. Instead, the *Creech* Court footnoted a string of citations, some of which were first degree murder convictions, and a good many of which were not. For instance, in *State v. Otto*, 102 Idaho 250, 629 P.2d 646 (1981), the conviction was of attempted first degree murder. Otto was charged with contracting for a murder, but, mistakenly dealing with a police officer, no murder took place. In *State v. Lopez*, 100 Idaho 99, 593 P.2d 1003 (1979), the crime of which defendant was convicted was assault with intent to commit murder, and the sentence was five years. The defendant in *State v. Garcia*, 102 Idaho 378, 630 P.2d 665 (1981), was convicted only of conspiracy to commit

murder. It is difficult to accept that the three justices who comprised the *Creech* majority made the "extensive and thorough review of Idaho murder cases" which it proclaimed in footnote 2, p. 476 of 670 P.2d, and at p. 375 of 105 Idaho.[7] More important is the question as to whether the Court is following the mandate of I.C. § 19–2827(c)(3)—which requires the proportionality review to be of the penalties imposed in *similar* cases. To date, other than the declaration in the *Creech* footnote, I do not see the Court as demonstrating that it has considered at all those cases where the penalty of life imprisonment was imposed. In *Creech, Osborn II*, and in *Sivak*, the dissenting opinions have suggested a considerable number of current first-degree murder cases where the death penalty was not imposed. As has been pointed out, district judges are required to transmit to this Court and to the attorney general copies of their § 19–2515 findings in *all* first degree murder sentencings whenever the death penalty has been imposed. An obvious shortcoming of the statute, I.C. § 19–2827(a) is the omission to require the transmission of the § 19–2515(d) findings where the death penalty has *not* been imposed. Any respectable proportionality review has to include findings made in *all* cases where the sentencing court decides between life and death. Although I have previously brought attention to this shortcoming, and believe that for the most part no one disagrees, the Court has done nothing. Other than for my own attempt at collecting all of such cases, and other than where there have been appeals from first degree murder convictions and imposed life sentences, the Court does not operate with a full deck. The legislature clearly contemplated that

---

**4.** The California Supreme Court's opinion is reported at 28 Cal.3d 935, 171 Cal.Rptr. 679, 623 P.2d 240 (1981). It contains no discussion of proportionality in examining the penalty phase.

**5.** *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

**6.** *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981).

**7.** Basing its holding on this *Creech* language, the *Sivak* majority said as to proportionality:
"Our review of similar cases involving the death penalty, while necessarily limited by the lack of such cases, as noted in *State v. Creech, supra,* does not reveal the presence of any particular excessiveness or disproportionality in this particular case."
*State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983).

the Court would rise to its responsibility, as noted by language to that effect contained in § 19–2827(a). Two recent cases where the sentence was not death have been forcibly brought to the attention of the Court by the State's petition for our review from decisions of the Court of appeals. *State v. Wilson,* 105 Idaho 679, 672 P.2d 247 (1983); *State v. Wilson,* 105 Idaho 669, 672 P.2d 237 (1983). Continuing with my own effort at providing the trial bench and the district courts with at least as much knowledge as have I in regard to proportionality, I have appended the trial judge's § 19–2515 findings in those two cases.

This case is much like that of *Bainbridge,*[8] which was discussed in *Sivak.* The sentencing judge here observed in his I.C. § 19–2515 findings that "the jury could have, and likely did, find that the defendant aided and abetted in Palmer's death and, consequently was guilty as a principal pursuant to the provisions of I.C. § 18–402." R., p. 689. The judge

"found, beyond a reasonable doubt, that:

. . . .

"(n) That either the defendant, Donald Paradise, or Larry Evans actually killed Kimberly Ann Palmer.

"(o) That the defendant either directly committed the act constituting the premeditated murder of Kimberly Ann Palmer or aided and abetted in its commission."

R., pp. 695–96.

The sentencing judge reflected upon the defendant's contrary argument:

"The primary arguments raised by the defendant in opposition to any finding that the killing was accomplished in a manner exhibiting an utter disregard for human life are, first, that the defendant is not guilty, i.e., that he did not kill Kimberly Ann Palmer, and, second, that there is no evidence that the defendant actually killed Miss Palmer.

"The problem with the first of these arguments is that the jury found to the contrary. The second argument is essentially an argument that, even though the defendant has been convicted as a principal in the murder, in order to sentence him to death for such crime, there must be evidence that he actually was the one who directly committed the manual strangulation of Kimberly Ann Palmer." R., p. 696.

Elaboration is unnecessary. Under any reasonable proportionality review of similar cases, and *Bainbridge* is one, the death penalty imposed on Gibson is extremely questionable. More flagrant murderers were those in *Osborn II* and *LePage,* both of whom were unquestionably the actual murderers. *Gibson,* on the other hand, according to the trial court, *may or may not* have been *the* person out of *three possibles* who attended to the strangling of the victim, or was but an aider and abettor. Thus, the case is seen to bear enough resemblance to *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), to require some comment. Enmund was the driver of the getaway vehicle in a planned robbery during which two principals killed the victims. There was no showing that Enmund intended the killings, only that he was, as here, a participant in the affair leading to the death of the victim. The court resolved the question in Enmund's favor.

"[I]t is for us ultimately to judge whether the Eight Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others *but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.* We have concluded, along with most legislatures and juries, that it does not.

. . . .

". . . The question before us is not the disproportionality of death as a penalty for murder, *but rather the validity of capital punishment for Enmund's own conduct.* The focus must be on *his* cul-

---

8. *State v. Bainbridge,* Supreme Court No. 14544, scheduled for oral argument January 14, 1984.

pability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'"

458 U.S. at 797–98, 102 S.Ct. at 3376–77 (emphasis added).

The court held that since Enmund's criminal culpability extended only to the robbery, imposition of the death penalty for Enmund's own culpability was excessive and disproportionate and thus a violation of the eighth amendment. Whether Gibson was in fact an aider or abettor was also an issue, and one upon which the court below found it necessary to give instructions requested by the prosecutor:

"YOU ARE INSTRUCTED that to aid and abet means to knowingly assist, facilitate, promote, encourage, counsel, solicit or invite the commission of a crime.

"YOU ARE INSTRUCTED that all persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, are principals in any crime so committed, and as principals are guilty of any crime so committed."

The majority opinion accurately sets forth damaging testimony which Gibson himself gave, omitting only that Gibson added that he left the room after ascertaining that Palmer was alive, and returned to find "Larry Evans was straddled over her choking her.... I saw Kimberly Palmer choked, she turned blue."—and admitted making no attempt to stop him because he was afraid to. Gibson's testimony as to his complicity is extremely damaging, and clearly he was an aider and an abettor, and perhaps solely responsible for the detention of the victim which but for such might have allowed her to escape being murdered.

I do not say that *Enmunds* requires this Court to automatically set aside the death penalty. But I do say that *Edmunds,* coupled with the sentencing judge's findings and remarks, do require discussion and consideration. Does the record sustain this Court, an appellate court, in concluding

that Gibson *intended that a killing take place, Enmunds, supra,* where the sentencing court made no such finding? It is readily apparent from the Findings that the district court believed there was no distinction whatever between finding a defendant guilty as an aider and abettor as against executing an aider and abettor:

"The court has been provided with no authority which holds that the general law applicable to persons convicted as a principal for a criminal offense (Idaho Code Section 18–204) is altered in any manner because the potential penalty involved is death. Thus, it requires no citation of authority to state that the law in Idaho has long been that a person who aids and abets in the commission of a crime is equally guilty as one who directly commits the act; and, of course, is subject to receiving the maximum punishment allowed by law. The crime of Murder In The First Degree can be punished by death. Idaho Code Section 18–4004. Neither that section of the code nor the sentencing provisions of I.C. 19–2515 provides for any different penalty in the event the conviction was had upon the basis that the defendant only aided and abetted in the commission of the crime.

"It must, therefore, be concluded that the legislature intended that a person who aided and abetted in the commission of the crime of Murder In The First Degree could be sentenced to death providing that the circumstances were such that the imposition of the death penalty was warranted pursuant to the provisions of Idaho Code Section 19–2515."

R., p. 699.

*Enmunds* seems to be to the contrary.

## APPENDIX

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

| STATE OF IDAHO | ) | |
| Plaintiff, | ) | FINDINGS OF THE COURT IN |
| | ) | CONSIDERING DEATH PENALTY, |
| v. | ) | UNDER SECTION 19-515 |
| | ) | IDAHO CODE |
| DAVID ZYNN WILSON, | ) | |
| Defendant. | ) | Criminal # C-4906 |

The above-named defendant having been convicted of the criminal offense of First

Degree Murder, a felony, Idaho Code Sections 18–4001/18–4003, which under the law authorizes the imposition of the death penalty; and the Court having Ordered a pre-sentence investigation of the defendant and thereafter held a sentencing hearing for the purpose of hearing all relevant evidence and argument of counsel in aggravation and mitigation of the offense;

NOW THEREFORE the Court hereby makes the following findings:

1. CONVICTION. That the defendant while represented by Court-appointed counsel was found guilty of the offense of First Degree Murder, a felony, Idaho Code Sections 18–4001/18–4003, pursuant to a plea of guilty.

2. PRE–SENTENCE REPORT. That a pre-sentence report was prepared by Order of the Court, and a copy delivered to the defendant or his counsel pursuant to Section 19–2515, Idaho Code, and the Idaho Criminal Rules.

3. SENTENCING HEARING. That a sentencing hearing was held on December 3 and 4, 1981, pursuant to notice to counsel for the defendant; and that at said hearing, in the presence of the defendant, the Court heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel.

4. FACTS AND ARGUMENT FOUND IN MITIGATION.

1) Defendant was not the trigger man and was, in fact, outside the building when the killing occurred.

2) No evidence that David had instructed Kelly to kill any of the victims if anything went wrong.

5. FACTS AND ARGUMENT FOUND IN AGGRAVATION.

1) Not able to cope with pressure and may act out against society again.

2) Background includes extensive use of drugs and/or alcohol.

3) Nothing parents of defendant have done in the past has served as a deterrent.

4) Extensive prior criminal record.

5) Capable of manipulation and remorse is questionable.

6) Moral character is undesirable.

7) Dishonorable discharge from service.

8) Uncooperative while on probation and under supervision in the past.

9) Acknowledged he has been a bad example and does not desire to be a good example even for his own family members.

6. STATUTORY AGGRAVATING CIRCUMSTANCES FOUND UNDER SECTION 19–2515(f), IDAHO CODE

1) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

2) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

3) The murder was one defined as murder of the first degree by Section 18–4003, Idaho Code, Subsection (d), and it was accompanied with the specific intent to cause the death of a human being.

7. REASONS WHY DEATH PENALTY WAS NOT IMPOSED. Defendant did not pull the trigger and had left the building when gun was fired; no competent evidence that he advised or suggested that Kelly use the gun if anything went wrong; Prosecution recommendation would increase the costs of appeal and lend weight to the defendant's arguments that the death penalty should not have been imposed.

## CONCLUSION

That the death penalty should not be imposed on the defendant for the capital offense of which he was convinced.

Dated this 7th day of December, 1981.

/s/ Edward J. Lodge
District Judge

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

| STATE OF IDAHO, | ) | |
| Plaintiff, | ) | FINDINGS OF THE COURT IN |
| | ) | CONSIDERING DEATH PENALTY |
| v. | ) | UNDER SECTION 19-515, |
| | ) | IDAHO CODE |
| KELLY BRIAN WILSON, | ) | |
| Defendant. | ) | Criminal # C-4906 |

The above-named defendant having been convicted of the criminal offense of First

Degree Murder, a felony, Idaho Code Sections 18–4001/18–4003, which under the law authorizes the imposition of the death penalty; and the Court having Ordered a pre-sentence investigation of the defendant and thereafter held a sentencing hearing for the purpose of hearing all relevant evidence and argument of counsel in aggravation and mitigation of the offense;

NOW THEREFOR the Court hereby makes the following findings:

1. CONVICTION. That the defendant while represented by Court-appointed counsel was found guilty of the offense of First Degree Murder, a felony, Idaho Sections 18–4001/18–4003, pursuant to a plea of guilty.

2. PRE–SENTENCE REPORT. That a pre-sentence report was prepared by Order of the Court, and a copy delivered to the defendant or his counsel pursuant to Section 19–2515, Idaho Code, and the Idaho Criminal Rules.

3. SENTENCING HEARING. That a sentencing hearing was held on December 3 and 4, 1981, pursuant to notice to counsel for the defendant; and that at said hearing, in the presence of the defendant, the Court heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel.

4. FACTS AND ARGUMENT FOUND IN MITIGATION.

1) The defendant was 19 years old when the offense was committed.

2) The defendant has no prior record (including no misdemeanors).

3) Defendant comes from a loving family that continues to support Kelly.

4) Defendant expresses remorse and is receptive to punishment.

5) The defendant pled guilty.

6) Prosecuting Attorney recommended against the death penalty.

7) Testimony supports a finding that the crime was out of character for Kelly and would not have happened but for the influ-ence of his older brother and the fact that they had been drinking.

8) The defendant is not likely to commit a similar crime in the future.

5. FACTS AND ARGUMENT FOUND IN AGGRAVATION. The crime fit all the material requirements of First Degree Murder, i.e.—intentional—malicious—deliberate and premeditated—no provocation for the offense.

6. STATUTORY AGGRAVATING CIRCUMSTANCES FOUND UNDER SECTION 19–2512(f), IDAHO CODE.

1) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

2) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

3) The murder was one defined as murder of the first degree by Section 18–4003, Idaho Code, Subsection (d), and it was accompanied with the specific intent to cause the death of a human being.

7. REASONS WHY DEATH PENALTY WAS NOT IMPOSED. The defendant's age and the fact that he did not have any prior record of any kind were persuasive in my decision that the crime was out of character for the defendant, and similar conduct would not likely occur in the future. The defendant was intoxicated and under the influence of his brother. Prosecution recommendation would lend weight to the defendant's arguments on appeal and increase the expense to the county.

CONCLUSION

That the death penalty should not be imposed on the defendant for the capital offense of which he was convicted.

Dated this 7th day of December, 1981.

/s/ Edward J. Lodge
District Judge